FILED

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

United States District Court
Albuquerque, New Mexico

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

Mitchell R. Elfers
Clerk of Court

| In the Matter of the Search of | | |
|---|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | |
| The 5 locations identified in Attachment A | ) | Case No. **24mr1521** |
| | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, which is attached hereto and incorporated herein.

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See attachment B, which is attached hereto and incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. § 1324(a)(1)(A)(ii); 18 U.S.C. §§ 875(a)-(c); 18 U.S.C. § 880; 18 U.S.C. § 1951 (a); e. 18 U.S.C § 1201 | Alien-Illegal Transportation; Interstate Communications; Receiving the Proceeds of Extortion; Conspiracy; Kidnapping |

The application is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Christine Morgan Zachry, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
Telephonically sworn and electronically signed *(specify reliable electronic means)*.

Date: 8/16/2024

_____
*Judge's signature*

City and state: Albuquerque, New Mexico

B. Paul Briones, U.S. Magistrated Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

IN THE MATTER OF THE SEARCH OF:

**The 5 locations identified in Attachment A**

Case No. _____

**AFFIDAVIT IN SUPPORT OF AN**
**APPLICATION UNDER RULE 41 FOR A**
**WARRANT TO SEARCH AND SEIZE**

I, **Christine Morgan Zachry**, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search the following locations (hereinafter the

"**Subject Locations**"):

> a.  **2929 Cabral Trail SW, Albuquerque, New Mexico 87121**, hereinafter "**Subject**
>
> **Location One**," further described in Attachment A-1, for the things described in
>
> Attachment B;
>
> b.  **233 Hanosh Court SE, Unit 3/C, Albuquerque, New Mexico 87123,** hereinafter
>
> "**Subject Location Two**," further described in Attachment A-2, for the things
>
> described in Attachment B;
>
> c.  **233 Hanosh Court SE, Unit 4/D, Albuquerque, New Mexico 87123,** hereinafter
>
> "**Subject Location Three**," further described in Attachment A-2, for the things
>
> described in Attachment B;
>
> d.  **233 Hanosh Court SE, Unit 2/B, Albuquerque, New Mexico 87123,** hereinafter
>
> "**Subject Location Four**," further described in Attachment A-2, for the things
>
> described in Attachment B;

e.   **1 Night Street, Edgewood, New Mexico 87015,** hereinafter "**Subject Location Five,**" further described in Attachment A-3, for the things described in Attachment B;

f.   I am also seeking concurrent authorization to search all vehicles that have an apparent connection to the **Subject Locations** and/or the Subjects identified in this affidavit, for the things described in Attachment B. Based on prior surveillance, this includes, but is not limited to, the following specifically identified vehicles (hereinafter the "**Subject Vehicles**"):

   i.   A Navy Toyota Tundra bearing license plate 5FA7AV, hereinafter "**Subject Vehicle One,**" photographed below;

 

2

ii.  A Black Toyota Highlander bearing license plate BWAZ25, hereinafter

   "**Subject Vehicle Two**," photographed below;

 

iii.  A white Cadillac Escalade bearing license plate 112XCH, hereinafter

   "**Subject Vehicle Three**," photographed below;

  

    iv.   A black 2023 Honda CR-V bearing license plate BWWC03, hereinafter

        "**Subject Vehicle Four**;" photographed below; and



    v.   A Gray 2016 KIA van bearing license plate BWAZ44, hereinafter

        "**Subject Vehicle Five,**" photographed below.



2.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since 2023. As such, I am a law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and I am empowered by law to conduct investigations and to make arrests for criminal offenses, to include those enumerated in 18 U.S.C. § 2516. I am currently assigned to investigate matters related to transnational organized crime and organized criminal enterprises. I have investigative training and experience related to conducting electronic and physical surveillance of subjects, executing arrest and search warrants, and analyzing public records. Through my training and experience, I am familiar with the methods and means used by individuals, drug trafficking organizations ("DTOs"), and gang/criminal enterprises to transport, store, and move controlled substances, firearms, and humans.

3.      In addition, I have received advanced training and instruction from state and federal agencies related to narcotics trafficking, organized crime investigations, money laundering, firearms trafficking, surveillance (both physical and technical), undercover operations, managing federal and local undercover employees ("UCE"), recruiting and managing confidential informants, analyzing financial records and phone records, serving arrests and search warrants, and issuing subpoenas. I have also taken a 40-hour course on Mexican cartels and "Narco" culture.

4.      I have been involved in an ongoing investigation regarding the illegal smuggling of immigrants into the United States, the kidnapping and extortion of these individuals, and ransom demands, by **DARWIN JEOVANNY PALMA PASTRANA, EDUAR ISREAL SAUCEDA-NUNEZ, and EXON CONRRADO NUNEZ-RODRIGUEZ**.  Since the

5

investigation's inception, I, as well as other Special Agents and Task Force Officers with the FBI, and law enforcement officials from other agencies have obtained information regarding the illegal activities of **DARWIN JEOVANNY PALMA PASTRANA, EDUAR ISREAL SAUCEDA-NUNEZ, EXON CONRRADO NUNEZ-RODRIGUEZ**, and others (the "SUBJECTS").

5.     I make this affidavit based upon my own personal knowledge, which is substantially derived from my participation in the investigation, as well as that of fellow agents and officers who have participated in the investigation.  In addition, I have developed information I believe to be reliable from additional sources including:

a.     Information provided by FBI Task Force Officers ("TFO"), FBI Special Agents ("SA"), Intelligence Research Specialists (IRS) of the Albuquerque Police Department, and other law enforcement officials ("agents"), including oral and written reports that I have received directly or indirectly from said investigators;

b.     Results of physical surveillance conducted by agents during the investigation;

c.     A review of telephone toll records and subscriber information;

d.     Information derived from recorded voice messages;

e.     A review of driver's license and automobile registration records;

f.     Records from commercial databases; and

g.      Records from the National Crime Information Center ("NCIC").

6.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## FEDERAL CHARGES RELEVANT TO THIS INVESTIGATION

7.      I believe there is probable cause that the SUBJECTS have committed, are committing, and will continue to commit offenses (hereinafter the "**Subject Offenses**") involving violations of, *inter alia*:

a.      8 U.S.C. § 1324(a)(1)(A)(ii) – Alien- Illegal Transportation;

b.      18 U.S.C. §§ 875(a)-(c) – Interstate Communications;

c.      18 U.S.C. § 880 – Receiving the Proceeds of Extortion;

d.      18 U.S.C. § 1951(a) – Conspiracy to Interfere, Attempt to Interfere, and Interference with Commerce by Extortion;

e.      18 U.S.C § 1201 – Kidnapping;

f.      18 U.S.C. § 1202 – Ransom Money; and

g.      18 U.S.C. § 1203 – Hostage Taking.

## EVIDENCE SOUGHT DURING SEARCH

8.      Based on my training, experience and participation in this and in similar investigations, I believe that individuals involved in the **Subject Offenses** often conceal

7

evidence of their criminal activities in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports and outbuildings.  They also conceal evidence in vehicles, including vehicles outside of their residences and businesses, so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences or businesses.  Evidence also may be found in other areas to which individuals involved in the **Subject Offenses** have ready access, such as rented storage areas and safety deposit boxes, or buried underground on their property. This evidence, which is discussed in detail in the following paragraphs, includes electronic devices, documentation that shows ownership/control of residences, storage facilities, or vehicles, bulk cash representing the proceeds of extortion and ransom demands as well as fees for immigrant smuggling, firearms, and pay/owe sheets.

9.      Individuals involved in the **Subject Offenses** often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses. Even after extortionate proceeds, ransoms, and fees related to the illegal smuggling of Immigrants into the United States are collected, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of victims, customers and co-conspirators. These records may be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay/owe sheets, IOUs, miscellaneous notes, money orders, customer

lists, and telephone address books. These records can reflect names, addresses and/or telephone numbers of associates and co-conspirators, customer lists, and amounts of money owed to the trafficker by customers/victims.

10.     Individuals involved in the **Subject Offenses** often travel domestically and internationally to facilitate their trafficking and ransom/extortionate activities. Evidence of foreign and domestic travel by persons engaged in such illegal activities includes travel itineraries, airline tickets, receipts, passports, and visas. These items are stored by the subjects on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of relatives and in cars. Many of these items are accessible via the internet and can be downloaded and saved on the computer or other digital media and on storage media.

11.     Individuals involved in the **Subject Offenses** often use storage facilities for bulk cash and other items related to human trafficking that are at a location away from their residences and businesses.  These off-site storage facilities are often commercial storage lockers and rooms. These locations are often used to store or hide contraband, money and other valuables.  Individuals involved in the **Subject Offenses** often keep documents and other items tending to show the existence of other contraband, money and other valuables in areas such as storage facilities. Those documents and other items include rental agreements, receipts, keys, notes and maps specifically concerning off-site storage rooms, lockers, and safety deposit boxes. This evidence may be found on their person or in their businesses, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars. This

type of documentation can be stored on digital media and concealed virtually anywhere.

12.     Other evidence of transportation, extortion, ransom, or kidnapping can include the following:  telephone bills to show numbers called by the subjects (and hence potential associates/victims), overnight mail receipts, bank statements, deposit and withdrawal slips, savings books, investment statements, loan statements, other financial institution statements, and federal and state tax returns. The above items are stored by the subjects on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars. This type of documentation can be stored on digital media and concealed virtually anywhere.

13.     Individuals involved in ethe **Subject Offenses** generally collect large sums of money. Because the fee to illegally smuggle an individual into the United States can be upwards of $10,000 per person, and ransom/extortionate demands are also generally thousands of dollars, individuals involved in the **Subject Offenses** may have thousands of dollars in cash on hand as proceeds of their illegal activity. In addition, individuals involved in the **Subject Offenses** often have other assets generated by their business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.

14.     Individuals involved in the **Subject Offenses** often try to legitimize the profits from their unlawful activity.  To accomplish this goal, subjects may utilize foreign and/or domestic banking institutions and their attendant services, real estate and businesses, both real and fictitious. They also try to secret, transfer and conceal the money by (a) placing assets in

10

names other than their own to avoid detection while maintaining control, (b) laundering money through what appears to be a legitimate business or businesses, (c) hiding the money in their homes, safes and safety deposit boxes, and/or (d) using the money to buy assets which are difficult to trace. This evidence is useful in a criminal prosecution, and it also is useful in identifying real and personal property that can be seized and forfeited by the government under existing laws. Documentation concerning this type of activity can be stored on digital media and concealed virtually anywhere.

15.     Evidence of significant, unexplained income of individuals involved in the **Subject Offenses**, or for the acquisition and concealment of money and assets of these activities, can be found on banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and canceled mail. These records can be maintained on paper, but also can be maintained as electronic data on computers and other digital media. The above items are typically kept subjects on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.

16.     The use of digital media, including smartphones, tablets, cellular phones, and digital devices, has become part of everyday life. This is also true for individuals involved in the **Subject Offenses**. Information stored in electronic form on all of the above-devices can provide evidence of criminal activity. Individuals involved in the **Subject Offenses** frequently use some or all of these devices to communicate with co-conspirators, customers, and victims.  These communications include, but are not limited to, phone calls, text messages, SMS (Short Message Service) messaging, MMS (Multimedia Messaging Service) messaging, social media posts and messaging, and smartphone application messaging services. Smartphones, tablets, cellular phones, and digital devices are frequently capable of storing messages, emails, social media communications, and communications made over smartphone applications. The content of these communications will often provide evidence of ethe **Subject Offenses**. Numbers stored on a telephone (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the subjects are victimizing, as well as who the subjects are calling, and thus the identity of potential associates.

17.     Individuals involved in the **Subject Offenses** often take, or cause to be taken, photographs and/or videos of their customers/victims as a "proof of life" or to be used during threats of force and violence absence an extortion/ransom payment.  They usually maintain these photographs and/or videos on their person or in their businesses, residences or cars, on computers, or in the residences of friends or relatives. Smartphones, tablets, cellular phones,

digital cameras, and other digital devices, often have the capability to take still photos and videos and save them indefinitely on the device's storage medium. Individuals involved in the **Subject Offenses** frequently use these devices to take their photographs and videos.

18.     Individuals involved in the **Subject Offenses** often maintain firearms and ammunition on their person or in their homes, businesses or cars to protect themselves and legitimize threats of force and violence to their victims. They also may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, firearms cleaning supplies, and instruction manuals and other documentation for firearms and ammunition.

19.     I know that weapons (including rifles, shotguns, and handguns) are tools of the trade for individuals involved in the **Subject Offenses**, who often keep firearms in close proximity to themselves, and their victims and proceeds, to legitimize threats of force and violence.

20.     Individuals involved in the **Subject Offenses** often conceal evidence of their crimes in vehicles outside of their residences for ready access and to prevent detection and seizure by officers executing search warrants at their residences.  This evidence, which is discussed in detail in the preceding paragraphs, includes bulk cash, pay/owe sheets, electronic storage devices (and their contents), photographs of customers/victims, firearms, digital devices such as cellular/mobile/smart telephones and tablets (and their contents), and counter-surveillance devices.

21.     Individuals involved in the **Subject Offenses** often utilize digital video surveillance systems. A digital video surveillance system is a surveillance system that is capable of capturing images, videos, and audio that can be compressed, stored or sent over communication networks. I know that it is common for digital surveillance systems to contain storage media that allow for 30 days or more of camera footage to be stored on the system. Digital video surveillance systems can be used for nearly any environment, including a commercial business or residence. I know that individuals involved in the **Subject Offenses** frequently use video surveillance systems to monitor who is approaching their residence, to ensure victims are not leaving their residence, and to assess whether the person presents a threat to the proceeds or customers/victims. Individuals involved in the **Subject Offenses** also utilize surveillance equipment to obtain advance notice when law enforcement arrives to hide or destroy evidence of criminal activity. However, given the constant recording that occurs with a digital surveillance system, it is also common that the digital video surveillance system will also depict evidence of the criminal activities and conversations related to criminal activities.

22.     Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the premises, including contraband and other evidence seized.  Documents and items showing the identity of the persons owning, residing in or controlling the area being searched include, but are not limited to, utility and telephone bills, canceled envelopes and correspondence, outgoing answering machine messages, tax returns, keys, deeds and mortgage receipts.  These documents may also be produced on

computers, downloaded from online accounts or scanned into digital format and stored on

computers and related digital media.

23.     The term "computer" includes all types of electronic, magnetic, optical,

electrochemical, or other high speed data processing devices performing logical, arithmetic, or

storage functions, including desktop computers, notebook computers, mobile phones,

smartphones, tablets, server computers, and network hardware. The term "digital media"

includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones,

iPods, iPads, digital cameras, and cellular telephones.  The term "storage media" includes any

physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy

disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

Collectively, the terms "computer," "digital media," and "storage media" are referred to as

"electronic media."

24.     A list of items agents seek authority to seize is in Attachment B.

## ELECTRONIC MEDIA AND FORENSIC ANALYSIS

25.     As described above and in Attachment B, this application seeks permission to

search for evidence and records that might be found in the **Subject Locations**, in whatever form

they are found.  Much of the evidence and records described in the paragraphs above, and in

Attachment B, can also be produced and/or stored on electronic media.  For this reason, I submit

that if a computer, digital medium, or storage medium is found in the **Subject Locations**, there is

probable cause to believe those records will be stored on that computer, digital medium, or

storage medium. Thus, the warrant applied for would authorize the seizure of electronic media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

26.     *Necessity of seizing or copying entire electronic media.*  In most cases, a thorough search of a premises for information that might be stored on electronic media often requires the seizure of the physical electronic media and later off-site review consistent with the warrant. In lieu of removing electronic media from the premises, it is sometimes possible to make an image copy of electronic media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the electronic media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

      a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Electronic media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.  Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the electronic media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.  Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of electronic media formats that may require off-site reviewing with specialized forensic tools.

27.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying electronic media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the computer or entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

28.  The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint,

17

thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant.  I seek this authority based on the following:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

18

c.  If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.  As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not

19

otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.  In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the

20

person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the **Subject Locations** and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

h.  Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the **Subject Locations** and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

21

## PROBABLE CAUSE

## K.I. USES A HUMAN TRAFFICKING ORGANIZATION TO ILLEGALLY ENTER THE UNITED STATES

29.      In or about October 2023, K.I.[1] left Guatemala with family members to Monterrey, Mexico, with the goal of crossing into the United States.  His family members crossed before him, because K.I. did not have enough money to cross.

30.      In or about February 2024, A.G., a family member of K.I., contacted her friend Maira Lorena Argueta Chapas ("Chapas"), who is from Guatemala, and asked Chapas to assist with arranging for K.I. to be illegally transported into the U.S.  A.G. knew that Chapas had connections to individuals who could smuggle illegal immigrants into the U.S. through the Mexico-Texas border.  K.I. had been living in Monterey, Mexico, for several months by that time.  A.G. and other family members paid approximately $12,000 for K.I. to be brought to the U.S.

31.      K.I. was taken to a house in Juarez, Mexico, where he was taken to a field and given instructions on how to cross into the United States.  Once in the United States, he was given directions to a warehouse in El Paso, Texas.  K.I. was taken to a residence in El Paso

---

[1] Based on my participation in this investigation, including my review of reports and in talking to other officers, I know the identities of K.I. and A.G, as well as J.C., V.R., and O.M.V.  To protect their identities and privacy, however, I have anonymized their identities here.

where he stayed for approximately two weeks.  At this location, K.I. was fed once per day and provided with minimal amounts of water.

32.     K.I. was then moved with other individuals to Phoenix, Arizona, where he stayed for a few days.  K.I. was then moved to Albuquerque, New Mexico.  K.I. remembered approximately 50 other migrants being held at the residence with him.

## K.I. IS TAKEN TO NORWALK, CALIFORNIA

33.     On or about March 31, 2023, late at night, K.I. and several other individuals were taken from the house in Albuquerque and put into a 2019 Honda Civic with New Mexico License Plate WNMU0120[2].  EDUAR ISRAEL SAUCEDA-NUNEZ was the driver.  They departed the area.

34.     On or about April 1, 2024, K.I. contacted A.G. through Facebook Messenger with audio messages, that were in Spanish, asking her to pick him up at 2:00 pm at 11353 Firestone Boulevard in Norwalk, California (a Jack in the Box), and A.G. confirmed she would meet him there.  K.I. also told her that SAUCEDA-NUNEZ mentioned there was an unpaid fee for K.I.'s transportation.

---

[2] This vehicle is registered to Exon Conrrado Rodriguez-Nunez at 901 Nicklaus Drive, Albuquerque, New Mexico 87124.

35.     At approximately 2:50 pm, A.G. was in the Jack in the Box parking lot and saw K.I. sitting in the passenger seat of the Honda Civic with a male she did not recognize in the driver's seat (later determined to be SAUCEDA-NUNEZ), and two other males in the backseat. A.G. approached the vehicle and began to record the interaction on her cell phone with the intention of sending the video[3] of the reunion with K.I. to his mother.  As she began approaching the front passenger side of the vehicle, she greeted K.I.  K.I. asked if his brother was going to provide more money.  A.G. stated that the total fee had been paid in full.  SAUCEDA-NUNEZ told her that there was a fee of $1,500 that had not been paid, and he directed A.G. to call Chapas to verify the outstanding fee.  A.G. called Chapas in the presence of SAUCEDA-NUNEZ to verify the money was paid in full.  Chapas confirmed the money had been paid, but SAUCEDA-NUNEZ would not release Victim K.I. from the vehicle.  K.I. stated he tried to exit the vehicle, but SAUCEDA-NUNEZ was holding down the automatic lock button, preventing him from being able to open the door.

36.     When later interviewed, K.I. stated that when he was staying in Albuquerque, he was told that people who did not follow their directions would be killed or "disappeared."[4]  With that in mind, K.I. was in fear for his life and complied with SAUCEDA-NUNEZ's orders.

---

[3] This video, which captures a portion of this interaction, is in Spanish, and has been roughly translated, as set forth herein.

[4]  Based on my training and experience, I know that "disappeared" is a term used by individuals engaged in the **Subject Offenses** to describe a situation when a criminal element kidnaps them and they are never heard from again – meaning they have essentially disappeared.

37.     A.G. told SAUCEDA-NUNEZ that she did not have any money and he abruptly drove off with K.I. still in the vehicle.  At some point after they drove away, K.I. utilized SAUCEDA-NUNEZ's phone to contact a family member over social media.  The family member told K.I. that A.G. had the additional $1,500.

38.     After SAUCEDA-NUNEZ drove off with K.I., and K.I. was speaking with a family member over social media about the required extra money, A.G. received a phone call at approximately 2:20 pm from phone number (480) 942-0790[5].  The caller, believed to be PASTRANA, stated that A.G. needed to pay the $1,500 or K.I. would be returned to New Mexico.  PASTRANA further said that people have already been killed in New Mexico after being returned, and that if A.G. did not pay the money, he would not be responsible for what happened to K.I.  A.G. stated that she took this to mean that if she did not pay the money, K.I. would be killed.

39.     Fearing that K.I.'s life was in danger, A.G. called 911 and deputies from the Los Angeles County Sheriff's Department ("LASD") responded.  A.G. was explaining to the deputies what she had witnessed with K.I. and SAUCEDA-NUNEZ when she began receiving multiple voice messages through "WhatsApp" from an unknown individual that threatened to kill K.I. if she did not pay the $1,500.  A.G. also showed the deputies the video she had taken of

---

[5] Information obtained from a Grand Jury Subpoena indicated the subscriber for the phone is DARWIN PALMA PASTRANA, with an address of 340 Utah Street NE, Albuquerque, New Mexico, with a service start date of June 7, 2023, and email address of PALMA@gmail.com.

Victim K.I.  As she was speaking with the deputies, she saw the Honda Civic return to the parking lot.[6]  A.G. directed the deputies to SAUCEDA-NUNEZ's vehicle that was approaching, but it quickly left the area, presumably to avoid the LASD presence.

40.     Deputies observed the Honda Civic fleeing the parking lot, at which time they pursued the vehicle and conducted a traffic stop.  Deputies detained three occupants of the vehicle and identified SAUCEDA-NUNEZ as the driver.  K.I. was identified as the front passenger, and another victim, with the initials J.C., was identified as the rear passenger.  Based on statements from A.G., K.I.[7], and J.C., SAUCEDA-NUNEZ was arrested for a violation of California Penal Code Section 209(a) - Aggravated Kidnapping, Section 210 - Extortion by Posing as a Kidnapper**,** and Section 236 - False Imprisonment[8].

---

[6]  It appears that A.G. was unaware at this time that K.I. had spoken to a family member over social media and been told that A.G. had the additional $1,500, causing SAUCEDA-NUNEZ to return to the Jack in the Box.

[7] K.I. was interviewed by FBI SA Minh D. Tran and TFO Alejandro Lopez (Pomona Police Department) on April 4, 2024.  This interview included several details that were inconsistent with the initial statement provided to the deputies on April 1, 2024.  These details include K.I. initially stating he had only been in the U.S. since March, that he had been homeless on the streets of Albuquerque since arriving in the U.S., and that SAUCEDA-NUNEZ had offered him a ride from New Mexico to California.

Based on my training and experience, as well as my participation in this investigation, it is common for victims, especially of violent crime, to be fearful of their aggressors as well as to be distrustful of authority figures, such as law enforcement.  This fear may cause victims to develop a psychological bond with their captors, and/or take steps to protect them.  The FBI has since attempted to, and been able to, corroborate some of the statements made by K.I. in his April 4th interview, including but not limited to: text messages/voice recordings in A.G.'s phone, independent statements from J.C. and CW, a review of the video taken by A.G., information obtained from Grand Jury Subpoenas, receipts of money transfers from Honduras found in SAUCEDA-NUNEZ's vehicle, and a search warrant conducted at 340 Utah Street NE, Albuquerque, New Mexico.

[8]  Ultimately, California state charges were not filed on SAUCEDA-NUNEZ, he was released from custody on or about April 3, 2024, and the incident was referred to the FBI for further investigation.

**DARWIN PALMA PASTRANA THREATENS A.G. AFTER EDUAR ISREAL**
**SAUCEDA-NUNEZ IS ARRESTED**

41.     After SAUCEDA-NUNEZ was arrested, A.G. received five text messages over What's App from PASTRANA who was using cellular phone (480) 942-9070.  I have seen photographs of these messages, which are in Spanish.  The messages were roughly translated into English as:

      a.  We are going to charge you old fucking hoe bitch, I'll find you because I'll find you.  Because of you being a bitch, they arrested my damn driver.

      b.  I will kill you because I kill you.

      c.  I already have your address and everything.  Do you think you can save yourself?

      d.  Damn you.

      e.  I kill you because I kill you.  Count your hours.

**SURVEILLANCE IS CONDUCTED AT 340 UTAH STREET NE, ALBUQUERQUE,**
**NEW MEXICO**

42.     On May 3, 2024, a warrant requesting precision data location, commonly referred to as a GPS Ping, was submitted to the Honorable Margo A. Riccone, United States Magistrate Judge for the Central District of California, for PASTRANA's phone, that is (480) 942-7090.  This warrant was granted on the same day, and investigators began receiving GPS data on May 3, 2024.  From reviewing the GPS data, I learned that on most nights/early mornings,

PASTRANA's phone was in the area of **Subject Location One,** indicating this was his residence.  I also learned that frequently during the day, PASTRANA's phone was in the area of 340 Utah Street NE, Albuquerque, New Mexico.

43.    On May 15, 2024, agents and Task Force Officers from the FBI conducted surveillance at the 340 Utah Street NE residence.  During surveillance, PASTRANA was observed arriving at the location driving a traditional yellow school bus.  In approximately one hour of surveillance, five vehicles were observed leaving the residence after PASTRANA arrived.  One of these vehicles was **Subject Vehicle One**.

44.    About 45 minutes after **Subject Vehicle One** left the Utah Street residence, surveillance units then went to **Subject Location One**.  When they arrived at the location, PASTRANA and an individual who was unknown at the time[9], were observed in the back of the truck, trying to remove a motorized bike from the bed of **Subject Vehicle One**.  PASTRANA and the other individual went into the garage of **Subject Location One** and the garage door closed.

## A SEARCH WARRANT IS SERVED AT 340 UTAH STREET NE, ALBUQUERQUE, NEW MEXICO

45.    On or about May 16, 2024, V.R., who was located in Tulsa, Oklahoma, was contacted by her uncle, O.M.V.  Her uncle used three different phones to contact her, with one of

---

[9]  This individual was later identified as CW in this affidavit.

28

the phone numbers being (480) 942-0790, that is PASTRANA's phone.  In the calls, V.R. was

told that O.M.V. was captured by the cartel and that she needed to pay $7,000 or O.M.V. would

be killed.

46.     On or about May 17, 2024, V.R. paid the kidnappers $500 via a wire transfer

from the application "Remitly[10]."  V.R. then received a proof-of-life photograph of O.M.V.

standing against the wall.  The proof of life photograph came from (480) 942-0790,

PASTRANA's phone.  The kidnappers told V.R. that she needed to pay more money.

47.     V.R. was able to use the Find my iPhone application to locate O.M.V.'s phone at

340 Utah Street NE, Albuquerque, New Mexico.  This is the subscriber address to

PASTRANA's phone, PASTRANA's address of record with the Motor Vehicle Division of New

Mexico, an area where GPS data shows PASTRANA's phone is frequently located, the location

where at least three vehicles are registered to PASTRANA, and a location where PASTRANA

has been observed during surveillance.

48.     On May 20, 2024, V.R. contacted the Tulsa Police Department ("TPD") to report

the kidnapping of O.M.V.  TPD told V.R. to contact APD, because O.M.V. was located in

Albuquerque.  V.R. contacted the APD[11].

---

[10] Remitly is an online service that offers international money transfers to over 150 countries.

[11] Agents from the FBI have since met with and interviewed V.R. in person.  From speaking to one of the interviewing agents, I learned that some of the information provided by V.R.  has not been able to be corroborated, and at times appears to be inconsistent with information obtained during the investigation.  For example, V.R. has

49.     Based on the information provided by VR, APD went to the 340 Utah Street NE residence to conduct a welfare check.  Upon their arrival, APD officers looked through windows and mail slots.  While looking through a mail slot, the APD officers observed approximately seven or eight Hispanic women, approximately 30-40 years old, sitting near the front door. Looking through a window on the north side of the residence, APD officers observed at least three women lying on a bed.  It appeared to the APD officers that the women were unable to leave the residence.  APD officers observed that the doors appeared to be locked from the outside with a barrel lock, the front door did not appear to be in use and was potentially welded shut, and the windows had wrought iron bars on them.  When the APD officers knocked and announced their presence at the front door, the lights in the residence were turned off and the APD officers lost sight of the women.  APD officers observed a male drive up in a red truck, appear to count the officers, and then quickly drove away.

50.     V.R. then received a phone call from the kidnappers stating they knew the police had been called and would now kill O.M.V.

_____

claimed that after providing information that led to the search warrant at 340 Utah Street NE residence, she began receiving threatening messages.  An investigation into the Internet Protocol Addresses associated to the threats showed that, at times, the IP addresses for the text message threats came back to the residence of VR, making it confusing to determine where the threats are actually coming from.  However, several parts of VR's allegations have been corroborated by the investigation thus far.  This includes corroboration by the evidence collected during the kidnapping/extortion/ransom demand of K.I. and A.G. in the Los Angeles area and evidence obtained during a search of 340 Utah Street NE, Albuquerque, New Mexico.  The investigation into VR's threat allegations remains ongoing.

51.     On May 21, 2024, a warrant requesting to search 340 Utah Street NE, Albuquerque, New Mexico, was submitted to the Honorable Steven C. Yarbrough, United States Magistrate Judge.  This warrant was granted on the same day under case number 24-MR-994.

52.     On May 21, 2024, the FBI served the search warrant at the 340 Utah Street NE residence.  During the search warrant, investigators seized cellular phones and a Rock Island Armory pistol.  They also observed a yellow school bus at the location that had a non-resident permit issued to Darwin Jeovanny Palma Pastrana and a vehicle with an Oklahoma license plate registered to EXON CONNRADO NUNEZ-RODRIGUEZ.

53.     Additionally, during the search approximately 57 individuals, most of which are believed to have been illegally smuggled into the United States, were recovered.  This includes 20 Mexicans, 8 Hondurans, 2 Ecuadorans, 2 Bolivians, and 1 Venezuelan.  One of the individuals contacted during the search was EXON CONNRADO NUNEZ-RODRIGUEZ.

## A CW IS CONTACTED AND PROVIDED INFORMATION TO THE FBI

54.     During the search, the FBI contacted and spoke with CW.  From speaking with the interviewing agents and reviewing reports of interviews, I learned that CW identified DARWIN PALMA PASTRANA as an individual he/she knew as "Pasha."  CW believed that PASTRANA managed a Human Smuggling Organization ("HSO") operation where individuals paid him to move men, women, and children, who had been illegally smuggled into the United States, to their final destinations.  CW believed there was a bus route that the HSO used from

Honduras to the United States.  CW further stated that the yellow school bus parked at the 340

Utah Street NE residence was destined to Honduras prior to the search warrant being served.

CW believed PASTRANA had seven more buses in Honduras that were used to move people.

55.     CW stated that PASTRANA used the proceeds from his HSO to buy houses and

vehicles.

56.     CW stated that a driver working for the HSO was present when the FBI served the

search warrant, and the CW identified the driver as "Exon" (referring to EXON CONRRADO

NUNEZ-RODRIGUEZ) and further advised that NUNEZ-RODRIGUEZ utilized the moniker of

"La Negra."  CW stated that PASTRANA managed at least three drivers, and the second in

command of PASTRANA's HSO was known as "King Kong."  CW advised that there was

another HSO stash house, which was referred to as a "la bodega," in Albuquerque, but did not

know the exact location.

57.     CW identified **Subject Location One** as being PASTRANA's primary residence.

CW has been to the location with PASTRANA to wash PASTRANA's vehicles.  CW stated that

PASTRANA lived at **Subject Location One** with his wife and child.  PASTRANA's brother,

and his wife and child also live at **Subject Location One.**

58.     CW has observed drivers for the HSO come to **Subject Location One** to meet,

and take payment, from PASTRANA.  CW observed the drivers leave the residence with duffle

bags believed to contain bundles of cash.  A week before the search warrant was served on the

340 Utah Street NE residence, CW saw one driver leave **Subject Location One** with approximately $80,000 in cash.  CW believed that PASTRANA conducted business at **Subject Location One** in a room in the far-right corner of the residence.  CW believes PASTRANA owned three firearms and knew him to carry a .45 caliber pistol on his person.

59.     CW stated that PASTRANA carried two cellular phones, one for customers that was replaced frequently and one he kept for a longer time.  CW stated that he/she had previously been tasked with replacing the phones for the HSO.

60.     CW explained that PASTRANA's HSO generally used the following protocol:

a.   An individual agrees to pay PASTRANA's HSO to transport their relative/associate across the border to their destination in the United Sates.

b.   A HSO member then contacts the paying individual/family member, giving them instruction on where to wire the money.  The initial deposit is $1,000 and is generally sent to couriers that work for PASTRANA.

c.   A HSO member makes a video of the smuggled individual, having the person say their name and location.  This video is then sent to the family member/associate, with a notice that a HSO member will reach out with additional instruction.

61.     At each checkpoint along the route to the smuggled individual's final destination, the family member/associate is expected to pay more money.  CW stated that the individuals

recovered as a result of the 340 Utah Street NE search warrant had only paid approximately $1,000.  Each of them had approximately $8,000 more to pay to PASTRANA's HSO.  CW believed the search warrant on the 340 Utah Street NE residence cost PASTRANA's HSO approximately $500,000.  CW stated that PASTRANA had a business associate in Juarez, Mexico, named "Alejandra."  Alejandra coordinates the movement of individuals on the south-side of the United States border, and talks frequently with PASATRANA, sometimes appearing to give him instruction.

62.    CW stated that the girls in the front room (presumably the females observed by the APD officers on May 21, 2024) of the 340 Utah Street NE residence had higher quality living conditions than the rest of the house.  The HSO members tried to get on good terms with the girls by buying them gifts. Sometimes the men would "take" the women they liked.

**2929 CABRAL TRAIL SW, ALBUQUERQUE, NEW MEXICO**

63.    Based on my training, experience, and knowledge of this investigation, I believe that PASTRANA manages a HSO that coordinates the illegal smuggling of individuals across the United States/Mexico border into the United States, and then to their final destinations within the United States.  I further believe that PASTRANA uses fear and threats of violence to ensure that payments are made, to include ransom and extortion payments, from individuals who are being transported by the HSO.

64.     I believe that PASTRANA lives at 2929 Cabral Trail SW, Albuquerque, New Mexico, that is **Subject Location One**.  I believe evidence of the Subject Offenses will be found at **Subject Location One**.  For example, I know that individuals that use electronic devices, such as cellular phones, keep such devices in their residence.  In this investigation, PASTRANA utilized a cellular phone to advise A.G. that K.I. would be killed if payment was not made, and later PASTRANA utilized a cellular phone to threaten to kill A.G. after she sought the assistance of law enforcement to recovery K.I.  I believe this cellular phone will be located at **Subject Location One** or on the person of PASTRANA.  CW stated that PASTRANA coordinates with an unknown co-conspirator named "Alejandra" that lives in Juarez, Mexico.  Communications between PASTRANA and Alejandra would presumably take place over an electronic device due to them being located in different countries.  I believe the electronic device that PASTRANA would use to communicate with Alejandra, and other co-conspirators, would be located at **Subject Location One** or on the person of PASTRANA.

65.     I further believe that paperwork or documentation that assists investigators in identifying the location of other stash houses operated by PASTRANA will be found at **Subject Location One**.  This includes possible locations in Phoenix, Arizona, El Paso, Texas, and additional locations in Albuquerque or Las Cruces, New Mexico.  I also believe that proceeds generated from PASTRANA's HSO will be found at **Subject Location One,** as well as documentation that identify the transfer of those proceeds to/from other co-conspirators.  From statements made by K.I. and A.G., I know that they paid approximately $12,000 to

35

PASTRANA's HSO.  I also know that CW advised that he/she had seen drivers working for PASTRANA get payment at **Subject Location One**, and additionally observed an individual leave with what was believed to be $80,000 in a duffle bag.

66.     CW stated that PASTRANA owned several firearms that were kept at **Subject Location One** and he frequently carried a .45 caliber pistol on his person.

67.     As described above, on May 15, 2024, surveillance observed PASTRANA arriving at the 340 Utah Street residence in a yellow school bus.  That same day, they also observed PASTRANA at **Subject Location One** with CW, as they loaded items from the back of a pickup truck into the garage.  Later, when CW was interviewed, he advised that **Subject Location One** was the primary residence for PASTRANA, and that PASTRANA lived at **Subject Location One** with his wife, child, brother, his brother's wife, and his brother's child.  Additionally, from reviewing GPS ping data for the phone belonging to PASTRANA, I learned that on most evenings and early mornings, the phone is located in the area of **Subject Location One**.

68.     On June 18, 2024, surveillance was conducted at **Subject Location One**.  During the surveillance, **Subject Vehicle Three** was observed arriving, and pulling into the garage, of the residence.  Only the beginning of the license plate could be observed by agents as "112X".  From previous surveillance, agents knew that vehicle to be driven by PASTRANA's brother,

ALLAN ALBERTO PALMA PASTRANA ("ALLAN").  This observation is consistent with statements made by CW of ALLAN living at **Subject Location One** with PASTRANA.

69.     On July 16, 2024, at approximately 5:55 am, surveillance was initiated on **Subject Location One**.  At approximately 10:24 am, PASTRANA exited the residence with what is believed to be his wife and child.  They entered **Subject Vehicle Four** that was parked in the driveway, PASTRANA as the driver, and departed the area.  About an hour and a half later they returned.  PASTRANA and his wife exited the vehicle carrying what appeared to be grocery bags into **Subject Location One**.  Approximately an hour later, PASTRANA exited **Subject Location One** and entered **Subject Vehicle Four** as a rear passenger.  Two unknown men exited **Subject Location One** with PASTRANA.  They entered the vehicle as driver and front passenger and departed the area.

## ADDITIONAL LOCATIONS USED BY PASTRANA AND THE HUMAN SMUGGLING ORGANIZATION

70.     Throughout the investigation, from speaking to CW, reviewing records, serving search warrants, and conducting surveillance, agents learned that PASTRANA and the HSO had several co-conspirators and utilized multiple locations to conduct criminal activity.  This includes **Subject Location One**, the residence of PASTRANA, and the 340 Utah Street NE residence.

71.     On May 29, 2024, FBI agents spoke to CW.  CW identified 233 Hanosh Court SE, Albuquerque, New Mexico, as a location that members of the HSO hang out.  This location is described as a multi-family dwelling, containing four individual apartment units.  Two units are located on the first floor, Apartment 1 and Apartment 2, and two units are located on the second floor, Apartment 3 and Apartment 4.  As agents and CW drove by the location, a grey Ford Mustang, New Mexico plate BSDW92, was observed parked out front.  CW identified the vehicle as being associated to the HSO.  CW advised that members of the HSO enter/exit the second floor, right hand side apartment.  This has been identified as 233 Hanosh Court SE, Apartment 3, Albuquerque, New Mexico ("**Subject Location Two**").  The license plate of the grey Ford Mustang was searched in the Motor Vehicle Division of New Mexico ("MVDNM") database and revealed that the registered owner was EDWIN ANTONIO RODRIGUEZ PASTRANA ("EDWIN") with a registered address of 233 Hanosh Court SE, Albuquerque, New Mexico[12].  CW has identified EDWIN as a driver for the HSO.  A black Toyota Highlander with New Mexico plate BWAZ25, **Subject Vehicle Two**, was observed parked to the front of the complex.  CW identified the vehicle as belonging to PASTRANA.  A search in the MVDNM

---

[12] EDWIN did not provide an apartment or unit number to the Motor Vehicle Division of New Mexico for his registration.  Based on my training and experience, I know that it is common for individuals involved in illegal activity to provide incorrect, or incomplete, regarding their address to government entities such as the Motor Vehicle Division to frustrate law enforcement investigations by making it difficult to determine their actual address.  In another example, when SAUCEDA-NUNEZ was arrested for kidnapping K.I. in the Los Angeles area, he provided his address to law enforcement as 233 Hanosh Court SE, Albuquerque, New Mexico, neglecting to provide a specific apartment/unit number.  His New Mexico issued driver's license follows the same practice, and when SAUCEDA-NUNEZ was involved in a traffic accident on March 12, 2024, in which he was not at fault, he again provided his address to law enforcement as 233 Hanosh Court SE, failing to identify a specific apartment/unit.

regarding **Subject Vehicle Two** revealed that it was registered to EDWIN, with a registered address of 233 Hanosh Court SE, Albuquerque, New Mexico.

72.     A query of the MVDNM database revealed that PASTRANA had other vehicles, registered in his name, to the Hanosh Court SE location.  This includes a 2018 grey Ford Expedition, New Mexico plate BMXZ91, registered to 233 Hanosh Court SE, Apartment A, Albuquerque, New Mexico[13] ("**Subject Location Three**"), and **Subject Vehicle Three**, registered to 233 Hanosh Court SE, Apartment D, Albuquerque, New Mexico ("**Subject Location Three**").  This is believed to be the same vehicle observed arriving at **Subject Location One** during surveillance on June 18, 2024.

73.     On June 7, 2024, surveillance was conducted at 233 Hanosh Court SE, Albuquerque, New Mexico.  Among the vehicles observed was the grey Ford Mustang registered to EDWIN.

74.     On June 11, 2024, surveillance was conducted at 233 Hanosh Court SE, Albuquerque, New Mexico.  During the surveillance, an unknown male was observed standing on the second-floor walkway before entering **Subject Location Three**.  Another unknown male was observed exiting from **Subject Location Four**, walking up the stairs, and entering **Subject**

---

[13] I have seen the apartments of 233 Hanosh Court SE identified by letter and number.  For example, Apartment A is also identified as Apartment 1, Apartment 2 as Apartment B, Apartment 3 as Apartment C, and Apartment 4 as Apartment D.  I believe these are the same locations.  There is not a second unit associated to 233 Hanosh Court SE that is labeled differently.

**Location Three**.  The activity is consistent with occupants of **Subject Location Three** and **Subject Location Four** having interchangeable access to each residence.

75.     On June 13, 2024, surveillance was conducted at 233 Hanosh Court SE, Albuquerque, New Mexico.  During the surveillance, **Subject Vehicle Five**, arrived at the complex.  Three individuals exited the vehicle.  Surveillance pictures were later shown to CW, who identified one of the individuals as a driver for the HSO, and one as an individual known as "Kiko."  CW stated that the unknown driver ("UD-1") had worked for PASTRANA for a long time.  CW stated that Kiko was from Sinaloa, Mexico, and oversaw the checkpoint in Juarez, Mexico, for the HSO.  The third man was identified as Victor Joel Escoto Rodriguez ("Rodriguez").  Rodriguez, Kiko, and UD-1 then walked into **Subject Location Four**.  A few minutes later, Rodriguez exited **Subject Location Four** and walked to **Subject Vehicle Five**.  Rodriguez opened the front passenger door.  ALLAN was then observed walking from a black Honda CRV (suspected to be **Subject Vehicle Four)** towards **Subject Vehicle Five**.  CW stated that ALLAN also works as a driver for PASTRANA.  Rodriguez then handed an unknown object to ALLAN.  Rodriguez then removed a manilla file folder from **Subject Vehicle Five**, as Kiko and UD-1 exited **Subject Location Four** and went to talk to ALLAN.

76.     Approximately 20 minutes later, UD-1 entered **Subject Vehicle Two** and left the area, returned about 5 minutes later, parked the car, and walked into **Subject Location Four**.  An unknown Hispanic male ("UM-1") walked to the complex.  UM-1 checked his phone and

looked around frequently before entering **Subject Location Four**.  About 10 minutes later, UM-1 exited Subject Location Four, walked to a black SUV with Oklahoma license plates, and departed the area.  Approximately 5 minutes later, ALLAN, Rodriguez, and Kiko all exited **Subject Location Four**[14].

77.     On July 16, 2024, surveillance was conducted at **Subject Location One**.  **Subject Vehicle Four** was identified parked and unoccupied in the driveway at 5:55 am.

78.     At approximately 1:31 pm, surveillance was initiated at 233 Hanosh Court SE, Albuquerque, New Mexico.  **Subject Vehicle Four** was observed parked and unoccupied at the Hanosh Court SE Complex.  At approximately 1:37 pm, Kiko exited **Subject Location Four**, entered the driver side of **Subject Vehicle Four,** and departed the Hanosh complex**.**  An unidentified male (UM-2) exited the Hanosh residence, entered an older model Dodge Ram, and departed the area.  Surveillance was unable to follow.

79.     Approximately an hour later, surveillance units located **Subject Vehicle Four** and a dark blue/black Dodge Ram at 1 Night Street, Edgewood, New Mexico ("**Subject Location Five**").  PASTRANA was observed sitting outside on the porch at **Subject Location Five**.  **Subject Vehicle Four** departed the area and was followed to a Smith's grocery store, where Kiko was observed as the driver.  Kiko met with an unknown Hispanic Male ("UM-3") who was

---

[14] ALLAN was not observed by surveillance entering **Subject Location Four**.

in a black Volkswagen minivan with an Alabama license plate.  Surveillance units then observed

what appeared to be three young Hispanic males exit the back seat of **Subject Vehicle Four** and

enter the Volkswagen minivan.  The **Subject Vehicle Four** was then followed to a Motel 6.

Around the same time, surveillance units observed UM-3 and one of the young Hispanic males

exit the minivan and enter Smith's.  Approximately 10 minutes later, UM-3 and the young

Hispanic male exited Smith's. UM-3 was pushing a shopping cart with a case of water and a

gallon jug of water, which were placed in the trunk of the minivan.  The young Hispanic male

was observed carrying a grocery bag with unknown items inside.  UM-3 then departed the area,

with the young Hispanic males, and proceeded to the Motel 6 where **Subject Vehicle Four** had

been followed.  Once arriving, UM-3 went into the motel office.  UM-3 exited the office about

10 minutes later, entered the minivan, and repositioned the car in the parking lot, where

surveillance lost sight of him.  At approximately 4:15 pm, the minivan was observed departing

the Motel 6.

80.      At approximately 6:07 pm, surveillance observed UM-3 return to the Motel 6 in

the minivan.  Surveillance also observed an unknown male (UM-4) driving **Subject Vehicle**

**Four**, with an unknown female ("UF-1") passenger, departing the Motel 6, and proceeding to

**Subject Location Five**.  At approximately 6:40 pm, PASTRANA was observed sitting on the

front porch of **Subject Location Five.**  At approximately 6:59 pm, UM-4 and UF-1 were

observed departing **Subject Location Five** and arriving at 450 Paisano Street NE, Albuquerque

(Quality Inn Albuquerque).  They arrived at **Subject Location One** at approximately 7:56 pm.

81.      On July 17, 2024, at approximately 5:55am, surveillance was initiated at **Subject Location One**.  At approximately 8:02 am, PASTRANA was observed leaving **Subject Location One** with his wife and child and proceeding to the Los Griegos Health & Social Service Center in **Subject Vehicle Four**.  The wife exited the vehicle and entered the social service center.  She returned about 5 minutes later holding a piece of paper.  PASTRANA then returned to **Subject Location One**. At approximately 10:15 am, a dark blue 2016 Honda CRV bearing New Mexico temporary tags arrived at **Subject Location One**, driven by an Unknown Male ("UM-5").  UM-5 entered **Subject Location One**.  Approximately 30 minutes later, PASTRANA and UM-5 exited **Subject Location One** and got into the CRV with temporary plates.  UM-5 was the driver and PASTRANA was in the front passenger seat.  They went to the El Pinon apartment complex located at 521 Charleston Street SE, Albuquerque, New Mexico, and parked in the south end of the parking lot.  About 45 minutes later, PASTRANA was observed exiting the apartment complex driving a black two door Dodge Ram bearing New Mexico temporary tags.  PASTRANA proceeded to the Hanosh Court SE complex. PASTRANA then left from the Hanosh Court SE complex and proceeded to **Subject Location Five**.  Surveillance did not see PASTRANA arrive at **Subject Location Five**, however did observe the Dodge Ram with temporary tags parked and unoccupied near the residence.

82.      Surveillance then observed the Dodge Ram leaving the area of **Subject Location Five** and proceeding to the Hanosh Court SE complex.  The Dodge Ram departed the Hanosh Court SE complex with another vehicle in tandem and went to a car wash on Zuni Road SE.  The

vehicles stopped briefly and then went to Campos Automotive and Tires, also located on Zuni

Road SE.  About 15 minutes later, the vehicles left the automotive shop and went back to the 233

Hanosh Court SE complex.  As the Dodge Ram arrived, **Subject Vehicle Four** arrived and

parked.  Two men exited from each vehicle, however surveillance was not able to observe

enough to identify them.  The four men went into an apartment in the 233 Hanosh Court SE

complex, however surveillance was unable to observe which unit they entered.

83.     At approximately 2:32 pm, PASTRANA and ALLAN were observed throwing

items in a dumpster after they exited **Subject Location Four**.  PASTRANA got into the black

Dodge Ram bearing temporary tags and departed the Hanosh complex.  PASTRANA arrived at

**Subject Location One**.  ALLAN was observed arriving at **Subject Location One** in **Subject

Vehicle Four,** at approximately 7:04 pm.

84.     On July 26, 2024, PASTRANA departed the vicinity of Cabral Residence in

**Subject Vehicle One**, at approximately 1:10 pm.  ALLAN departed **Subject Location One** in

**Subject Vehicle Three** and arrived at Hanosh Court SE Complex.  PASTRANA arrived shortly

thereafter in **Subject Vehicle One**.  PASTRANA entered **Subject Location Two**.  ALLAN

exited **Subject Location Four** briefly to **Subject Vehicle Three** and returned inside.  Kiko

exited **Subject Location Four,** tossed some garbage bags in the dumpster, and returned inside.

PASTRANA exited **Subject Location Two**.  An Unknown Hispanic Male and Unknown

Hispanic Female arrived in a dark blue Toyota Corolla bearing New Mexico temp tag 24T-216870, briefly interacted with PASTRANA, and entered **Subject Location Two.**

85.     At approximately 3:00 pm, an Unknown Hispanic Male (UHM-1) arrived in a silver Honda Pilot bearing Texas, University of Houston tag 02238.  UHM-1 briefly interacted with Kiko and both entered **Subject Location Two.**  About twenty minutes later, PASTRANA, ALLAN, Kiko, EDWIN, and UHM-1 departed Hanosh Court SE Complex in **Subject Vehicle One.  Subject Vehicle One** arrived at American Freight, where employees loaded a bed frame, mattress, and box spring into the truck bed.  **Subject Vehicle One** departed American Freight and arrived at **Subject Location One.**  PASTRANA, ALLAN, Kiko, UHM-1 and EDWIN brought the bed inside, at approximately 4:24 pm.

86.     At approximately 5:09 pm, ALLAN's female partner and child arrived **Subject Location One** in **Subject Vehicle Four.**

87.     On July 29, 2024, **Subject Vehicle One** and **Subject Vehicle Three** were surveilled at Hanosh Court SE complex, at approximately 3:53 pm.  Both vehicles departed Hanosh Court. **Subject Vehicle One** was observed at **Subject Location Five,** at approximately 4:27 pm**.  Subject Vehicle Three** was observed east on Roberts Drive, in the vicinity of **Subject Location Five**.  **Subject Vehicle One** departed at approximately 5:40 pm.

88.     On August 1, 2024, surveillance was conducted at **Subject Location One**.  At approximately 4:11 pm, PASTRANA and Kiko departed **Subject Location One** in **Subject**

**Vehicle Four** and arrived at BMC Tactical at 2615 Coors Blvd. SW, Albuquerque, NM.

PASTRANA and Kiko exited BMC Tactical and departed at approximately 4:27 pm.

PASTRANA and Kiko made stops at Isleta Livestock and El Camino Real Academy before

arriving at Hanosh Court SE complex, at approximately 4:57 pm.

89.     PASTRANA and Kiko entered and exited units, 2, 3, and 4 (**Subject Location

Four, Two, and Three**) multiple times.  Kiko departed the Hanosh Court SE complex in a 2016

Toyota Highlander.  Kiko returned with pizza boxes and entered **Subject Location Two**, at

approximately 6:04 pm.

90.     At approximately 6:44 pm, PASTRANA departed Hanosh Court SE complex in

**Subject Vehicle Four.**  PASTRANA arrived at Wienerschnitzel parking lot at 110 Juan Tabo

Blvd. NE, Albuquerque, New Mexico.  A white 2007 Chevrolet Avalanche arrived at the

Wienerschnitzel parking lot shortly thereafter.  Three unknown individuals were observed in

between **Subject Vehicle Four** and the Avalanche.  The three unknown individuals appeared to

have entered **Subject Vehicle Four**.

91.     At approximately 6:59 pm, PASTRANA arrived at Hanosh Court SE complex in

**Subject Vehicle Four.**  Surveillance did not observe the three unknown individuals exit **Subject

Vehicle Four** while at the Hanosh Court SE complex.  PASTRANA , Kiko, and other males sat

in lawn chairs on the balcony of 233 Hanosh Court SE.  PASTRANA departed Hanosh Court SE

complex in **Subject Vehicle Four**.  **Subject Vehicle Four** was parked in front of **Subject**

**Location One** at 8:40 pm.  **Subject Vehicle Five** arrived at **Subject Location One**, at approximately 8:56 pm.

92.     On August 2, 2024, surveillance was conducted at **Subject Location One**.  At approximately 8:48 am, **Subject Vehicle Four** was parked in the driveway of the Cabral residence.  Over an hour later, the garage door opened, and surveillance observed a Tundra and black Highlander inside the garage.  PASTRANA repositioned **Subject Vehicle Four** and entered **Subject Vehicle One**.  PASTRANA departed the residence and arrived at Hanosh Court SE complex.  PASTRANA entered **Subject Location Four**, at approximately 10:30 am.

93.     Based on my training, experience, and knowledge of this investigation, I believe that PASTRANA controls a HSO that smuggles immigrants illegally in the United States and transports them to locations throughout the country.  This HSO also extorts money from the immigrants.  Failure to pay results in kidnapping, ransom demands, and threats of violence.  I believe that PASTRANA lives at **Subject Location One,** and as described above, I believe evidence of the Subject Offenses will be found at the location.

94.     I also believe that **Subject Location Five** could be a stash house, similar to the 340 Utah Street residence where the FBI recovered 57 migrants that had been illegally smuggled into the United States.  Kiko was identified by CW as being a driver for PASTRANA's HSO, and is believed to live at **Subject Location Four**.  During the July 16, 2024, surveillance detailed above, Kiko was observed leaving the Hanosh Court SE complex in **Subject Vehicle**

**Four**, believed to be by himself, and proceeding to **Subject Location Five**.  Kiko left **Subject Location Five** after short time and was then observed in the parking lot of nearby grocery store, except now he had three young Hispanic males in his vehicle.  I believe these three males may have come from **Subject Location Five** and that the individual with the Alabama license plate was  a family member that had arranged for one or more persons to be smuggled into the United States, or other drivers that would be bringing the males to their final destination.  I believe **Subject Location Five** could contain immigrants illegally smuggled into the United States as well as firearms (similar to what was recovered at the 340 Utah Street residence), documentation of payments received/owed (commonly referred to as a pay/owe sheet), and electronic devices used by co-conspirators to communicate with each other, take proof-of-life photographs and collect/send extortion proceeds.

95.     I also believe that PASTRANA's HSO uses several units located at the 233 Hanosh Court SE complex.  Surveillance units have observed Kiko, Rodriguez, and an unknown driver entering **Subject Location Four**.  CW described Kiko as a driver and overseer of the checkpoint in Juarez, Mexico.  I believe that **Subject Location Four** will contain records of transporting migrants illegal in the United States, such as pay/owe sheets, notes identifying the names of migrants and contact information of their families to collect money, electronic devices that are used to communicate with other co-conspirators, take proof-of-life photos, and collect/send extortion proceeds.

48

96.     **Subject Location Three** is a residence that PASTRANA has a vehicle registered at, specifically, a Cadillac Escalade with New Mexico plate 112XCH, (**Subject Vehicle Three),** known to be driven by ALLAN.  Additionally, during a surveillance on June 11, 2024, individuals from **Subject Location Four**, that is the residence of Kiko, Rodriguez, and the UD-1, walked freely from **Subject Location Four** to **Subject Location Three**.  I believe this indicates that **Subject Location Three** is accessible to members of PASTRANA's HSO.  I believe **Subject Location Three** will contain records of transporting migrants illegal in the United States, such as pay/owe sheets, notes identifying the names of migrants and contact information of their families to collect money, and electronic devices that are used to communicate with other co-conspirators, take proof-of-life photos, and collect/send extortion proceeds.

97.     CW identified a driver for PASTRANA, believed to be EDWIN, as living at **Subject Location Two**.  A Ford Mustang registered to EDWIN has been observed at the 233 Hanosh Court SE complex on several occasions.  This vehicle is registered to EDWIN at 233 Hanosh Court SE, however it does not contain a unit/apartment number.  The same is true for EDWIN's driver's license.  My understanding of the complex is that there is no 233 Hanosh Court SE location that does not contain a unit number, either 1 or A, 2 or B, 3 or C, or 4 or D. During surveillance on June 13, 2024, a female was observed standing in the doorway of **Subject Location Two**.  CW identified the female as the wife of the owner of the Ford Mustang. I believe **Subject Location Two** will contain records of transporting migrants illegal in the

United States, such as pay/owe sheets, notes identifying the names of migrants and contact information of their families to collect money, and electronic devices that are used to communicate with other co-conspirators, take proof-of-life photos, and collect/send extortion proceeds.

98.     I also believe that PASTRANA's HSO uses a several vehicles to facilitate the organization's business.  **Subject Vehicle One, Subject Vehicle Three,** and **Subject Vehicle Four** were observed at multiple of the Subject Locations and driven by known HSO members and leaders.  **Subject Vehicle Two** was observed multiple times at the Hanosh Court SE complex and is registered to EDWIN.  **Subject Vehicle Five**, which is registered to Rodriguez, was observed multiple times at the Hanosh Court SE complex.

## CONCLUSION

99.     I submit that this affidavit supports probable cause for a warrant to search the **Subject Locations** described in Attachment A and seize the items described in Attachment B.

100.    This affidavit was reviewed and approved by Assistant United States Attorney Timothy Trembley.

Respectfully submitted,

Christine Morgan Zachry
Special Agent

50

Federal Bureau of Investigation

Electronically signed and telephonically sworn on August 16, 2024:

_____
UNITED STATES MAGISTRATE JUDGE

51

## ATTACHMENT A-1

*Property to be searched*

The property to be searched is **2929 Cabral Trail SW, Albuquerque, New Mexico 87121**, hereinafter "**Subject Location One**," for the things described in Attachment B. Subject Location One is a single-story, single-family home with a pitched roof and a two-car garage. The front of the property faces the east, and the front door is on the south side of the house. The house is gray in color. A photograph of the property, taken on May 24, 2024, is included below.



## ATTACHMENT A-2

*Property to be searched*

The property to be searched is:

       a.  **233 Hanosh Court SE, Unit 3/C, Albuquerque, New Mexico 87123,** hereinafter "**Subject Location Two**," for the things described in Attachment B.

       b.  **233 Hanosh Court SE, Unit 4/D, Albuquerque, New Mexico 87123,** hereinafter "**Subject Location Three**," for the things described in Attachment B.

       c.  **233 Hanosh Court SE, Unit 2/B, Albuquerque, New Mexico 87123,** hereinafter "**Subject Location Four**," for the things described in Attachment B.

Subject Locations Two, Three, and Four are units in a multi-family residence with a flat roof.  The building is made up of four units, with all front doors facing north.  The building is tan with white front doors. There is one staircase in the center of the norths-side of the building. A

2

photograph of the property, taken on August 8, 2024, is included below. A diagram of the multi-family structure is included below, as well.



```
 _____
|        |       |
| Apt 4  | Apt 3 |   2nd Floor
|_____|
|        |       |
| Apt 2  | Apt 1 |   1st Floor
|_____|
```

## ATTACHMENT A-3

*Property to be searched*

The property to be searched is **1 Night Street, Edgewood, New Mexico 87015,**

hereinafter "**Subject Location Five**," for the things described in Attachment B.  Subject

Location Five is a single-story, single-family residence with a blue pitched roof.  The house is

tan with white pillars and a white fence surrounding the property. A photograph of the property,

taken on July 12, 2024, is included below.



4

## ATTACHMENT B

*Property to be seized*

All records, information, and evidence relating to violations of  8 U.S.C. §

1324(a)(1)(A)(ii) – Alien- Illegal Transportation; 18 U.S.C. §§ 875(a)-(c) – Interstate

Communications; 18 U.S.C. § 880 – Receiving the Proceeds of Extortion; 18 U.S.C. § 1951(a) –

Conspiracy to Interfere, Attempt to Interfere, and Interference with Commerce by Extortion; 18

U.S.C § 1201 – Kidnapping; 18 U.S.C. § 1202 – Ransom Money; and 18 U.S.C. § 1203 –

Hostage Taking, those violations involving **DARWIN JEOVANNY PALMA PASTRANA,**

**EDUAR ISREAL SAUCEDA-NUNEZ, and EXON CONRRADO NUNEZ-RODRIGUEZ**

and occurring after **January 1, 2023,** including:

1. Large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of human smuggling transactions.

2. Any and all human smuggling customer lists, human smuggling records, distributor lists, or any notes containing the individual names of such persons, telephone numbers, addresses of these customers or distributors, and any corresponding records of accounts receivable, money paid or received, transportation services rendered, or cash received to pay for or intended to pay for transportation services rendered.

3. Telephone and address books or notes containing telephone numbers and addresses of co-conspirators.

5

4. Telephone toll records for homes and/or businesses owned or controlled by suspected co-conspirators, or other communication devices used by them and/or their human smuggling associates.

5. Messages, notes, correspondence, and/or communications between human smuggling associates.

6. Indications of ownership or control of said premises and/or other premises used in unlawful human smuggling activity, including but not limited to, utility bills, cancelled checks, or envelopes and deeds or leases.

7. Indications of ownership or control over any vehicles located at the place to be searched, including but not limited to, titles, registrations, gas receipts, repair bills and keys belonging to that vehicle.

8. Records, receipts, bank statements and records, money drafts, letters of credit, money orders and cashier's checks received, passbooks, bank checks, safe deposit box keys, vault keys, safes and other items evidencing the obtaining, secreting and/or concealment, and or expenditures of money.

9. Any and all financial or other instruments evidencing placement of assets in the names other than the names of the drug traffickers themselves.

10. Books, records, receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers relating to receipt and transportation of smuggled persons and the outstanding debts and collections from the transportation of smuggled persons.

6

11. Photographs or videos of the human smugglers, their co-conspirators and the property and assets purchased with human smuggling proceeds.

12. Other financial records, which may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel.

13. Firearms and ammunition, including but not limited to handguns, rifles, shotguns and automatic weapons.

14. Digital video surveillance systems, including the associated storage media.

15. Any and all computers, digital media, and storage media that reasonably appear to contain some or all of the records, information, and/or evidence described in Attachment B.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer, digital media, or storage media; any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.

The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

7

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware.

This warrant authorizes a review of all electronic media seized pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The warrant also authorizes a review of all electronic media for evidence of who used, owned, or controlled the electronic media at the time the things described in this warrant were created, edited, or deleted. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, law enforcement may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

During the execution of the search of the **Subject Locations** described in Attachments A1-3, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual who is found at the **Subject Locations** and reasonably believed by law enforcement to be a user of a device found at the premises, to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

The search of the **Subject Locations** described in Attachments A1-3 shall include the search of the entire residence, all attached and unattached garages and storage areas/containers (including mailboxes and trash cans) on the **Subject Locations**, and all persons located in the **Subject Locations** in or on which the items to be seized could be concealed.  The search shall also include all vehicles parked at, or in front of, the **Subject Locations** that have an apparent connection to the **Subject Locations** and/or the SUBJECTS. Connection to the vehicle may be established by evidence that anyone residing at the **Subject Locations** and/or the SUBJECTS own, operate, and/or have access to any vehicle parked at or in front of the **Subject Locations**. Evidence includes prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key. This specifically includes the Subject Vehicles described in the affidavit.